THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ISIAH J. JONES, | ) | 4:05CV3053 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| NEBRASKA DEPARTMENT | ) | |
| OF CORRECTIONAL SERVICES, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

Isiah Jones, a state prisoner, brings this 42 U.S.C. § 1983 action against prison personnel, alleging deliberate indifference to his serious medical conditions. Specifically, Jones contends that Dr. Janssen Williams and Kris Galatis—the only two defendants remaining in this case—violated his Eighth Amendment right to be free from cruel and unusual punishment in two ways: (1) by failing to adequately treat his hypertension; and (2) by failing to properly treat a fracture located on the proximal phalanx of his right index finger. (Filing 113, Second Amended Complaint.) Williams and Galatis have filed a motion for summary judgment on the merits.[1] (Filing 187.) I shall grant their motion and dismiss this case.

---

[1] Plaintiff's complaint and amended complaint (filings 1, 19), filed pro se, named a multitude of defendants. The court then appointed counsel for Plaintiff, and counsel filed a second amended complaint (filing 113) which named only four defendants: the Nebraska Department of Correctional Services, Frank Hopkins, Dr. Janssen Williams, and Kris Galatis. In a prior order disposing of summary judgment motions that were filed by some of the defendants that had been sued in one or more of the three complaints, the court ruled that "[t]his case will proceed against Defendants Dr. Janssen Williams and Kris Galatis." (Filing 161, at 1.) Hence, Williams and Galatis are the only remaining defendants, and I shall deny as moot the portion of the pending summary judgment motion that has been filed on behalf of Dave Thomas. (Filing 187, Motion for Summary Judgment on Behalf of Defendants

## I.  UNDISPUTED MATERIAL FACTS[2]

1.     At the time this action was filed, Jones was an inmate incarcerated at the Tecumseh State Correctional Institute (TSCI). He is currently housed at the Nebraska State Penitentiary, having been transferred to that facility on or about April 18, 2006. (Filing 113, Second Amended Complaint ¶ 12.)

2.     Dr. Williams is a medical doctor privately contracted to provide medical services to inmates housed at TSCI. Dr. Williams has been a licensed physician for the past 17 years. (Filing 189-2, Williams Depo. 8:8-10:14.) At all relevant times, Dr. Williams has served as the Medical Director at TSCI. (*Id.*) Dr. Williams' specialty is internal medicine. (*Id.*)

3.     At all relevant times, Kris Galatis was a physician's assistant who

---

Williams, Galatis & Thomas.)

[2]The defendants have filed a motion for summary judgment and, in accordance with our local rules, have included in their supporting brief a statement of material facts, consisting of 22 numbered paragraphs with appropriate references to the pleadings, affidavits, and other filed evidentiary materials. *See* NECivR 56.1(a). Jones has not controverted many of these material facts; hence, such facts will be deemed admitted. *See* NECivR 56.1(b)(1) ("Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.") (emphasis in original). Jones purports to "dispute" other of Defendants' stated facts by his own affidavits, one of which will not be considered because it is neither sworn under oath, nor subscribed by Jones to be true under penalty of perjury. (Filing 193, Ex. 2, Aff. Isiah Jones Material Facts.) Many of Jones' "disputed" facts are not contradictions of the defendants' statement of facts, but simply additional facts regarding Jones' motivations for his actions (i.e., why he refused his medication and to have his heart monitored). (*See* Filing 192, Pl.'s Br. Opp'n Mot. Summ. J. at 2-4.) Thus, I have also deemed admitted those facts not directly disputed by Jones.

provided medical services to inmates at TSCI. (Filing 189-6, Williams Aff. ¶ 4.)

*Jones' Hypertension*

4. Dr. Williams is very familiar with Jones' medical history. Dr. Williams has treated Jones off and on from 2002 to April of 2006. (Filing 189-2, Williams Depo. 13:20-21.) Dr. Williams and Jones are related as first cousins. Jones' mother and Dr. Williams' father are brother and sister. (*Id.* at 13:14-19.)

5. Dr. Williams began treating Jones' hypertension in 2002 at TSCI. (Filing 189-2, Williams Depo. 13:20-25.) Dr. Williams estimates that while Jones was incarcerated at TSCI, he examined Jones "almost like once a week, if not every other week." (*Id.* at 15:20-23.)

6. Jones was diagnosed with hypertension sometime in 1987. (Filing 113, Second Amended Complaint ¶ 13.) Upon entering TSCI, Dr. Williams testified that he reviewed Jones' entire medical chart prior to taking over Jones' treatment. (Filing 189-2, Williams Depo. 27:1-15.) Dr. Williams recalls that in 2002, Jones' hypertension was severe to moderate at times. (*Id.* at 27:16-19.) Dr. Williams began treating Jones' hypertension with blood pressure medications and dehypertensives. (*Id.* at 28:6-9.)

7. While Jones was an inmate at TSCI, numerous efforts were made to place Jones on a medication that would control his hypertension. (Filing 189-6, Ex. 4, Williams Aff. ¶ 7.) Jones was offered numerous medications, including, but not limited to: Hytrin, Clonodine, Inderol, Lopressor, Procardia, Norvasc, Cozaar, Vasotec, Dyazide and Lasix. (*Id.* ¶ 9.) Dr. Williams testified that "[w]hen [Jones] took the medication, his blood pressure would come down." (Filing 189-2, Williams Depo. 28:13-14.) However, Jones would usually stop taking his medications before the medical staff at TSCI could get Jones' blood pressure to a therapeutic range. (*Id.*

3

at 28:20-25.) Jones claims he stopped taking the recommended medications because, in his opinion, the medicines were causing life-threatening side effects that the medical staff refused to investigate. (Filing 193-10, Jones Aff. at 1.)

8. The medical staff at TSCI made numerous attempts to ensure that Jones was taking medication to treat his hypertension. While Jones was in the general population at TSCI, Dr. Williams and the medical staff at TSCI attempted to make Jones "come to the window" to take his medications as a way to supervise Jones and determine whether he was taking the medication that was given to him. (Filing 189-2, Williams Depo. 31:3-32:14.) Jones refused to come to the window and take his medications every day. In fact, Jones stopped taking his medications altogether on August 18, 2004. (Filing 189-6, Williams Aff. ¶ 7.)

9. In his medical opinion, Dr. Williams believes that the "side effects" Jones complained of were the result of heart problems, not the prescribed medications. Dr. Williams attempted to substantiate his suspicion through use of an event monitor. In order to run the event monitor, Jones was required to stay in the hospital for a number of days. He refused on at least three occasions.[3] As explained by Dr. Williams:

> I called for the event monitor, sent the event monitor back and called for it again for him. We even kept it here for a couple of months hoping he would change his mind and he never did.

---

[3] Jones claims that he refused use of the event monitor because he would not sign a "responsibility note for $700," a nurse did not know how to read the monitor, and because he was told that he could not work on his lawsuit while he was in the hospital. (Filing 192, Pl.'s Br. Opp'n Mot. Summ. J. at 2; Filing 193-8, Aff. Jones.) The reasons that Jones refused to wear the event monitor are largely irrelevant. The fact remains that Jones' refusals prevented Dr. Williams from determining whether Jones' alleged side effects were the result of the hypertension medication or something else.

(Filing 189-2, Williams Depo. 37:15-38:23.) Dr. Williams was concerned that Jones had "an arrhythmia going on that could be life[-]threatening," but Jones "would never let me evaluate . . . whether or not it was the medication versus the irregular heartbeat." (*Id.* at 38:2-23.)

***James A. Fosnaugh, M.D.***

10. James A. Fosnaugh, M.D. ("Dr. Fosnaugh") is a board-certified physician, practicing in the area of internal medicine. Dr. Fosnaugh has been in private practice since 1982. (Filing 189-3, Fosnaugh Depo. 4:19-5:10.)

11. Dr. Fosnaugh was asked by Mr. Jones' family if he would evaluate Jones and provide a second opinion. Dr. Fosnaugh examined Jones on January 25, 2006, and reviewed the care and treatment provided by Defendants. (Filing 189-3, Fosnaugh Depo. 6:8-20.) After this examination and review of Jones' medical records, Dr. Fosnaugh opined that Dr. Williams and his staff "were . . . keeping a close eye on things, to try to bring his blood pressure under control. They had actually consulted other doctors, including heart specialists." (*Id.* at 12:18-23.) Regarding whether TSCI medical personnel were adequately attempting to control Jones' hypertension, Dr. Fosnaugh stated that "they were trying to do the best possible job"; nothing that had been done was inappropriate; "they were doing all the reasonable things"; and "[Jones'] unwillingness to use medications was making management more difficult." (*Id.* at 15:22-17:18.) Dr. Fosnaugh concluded that "Mr. Jones is receiving the best possible care by the medical staff at the Tecumseh Facility. The care seems appropriate and reasonable and is only hampered by Mr. Jones' own unwillingness to comply with the medication regimen." (Filing 189-3, at CM/ECF

p. 25.)[4]

### *Jones' Broken Finger*

12.    In addition to his hypertension, Jones also alleges that Defendants were deliberately indifferent to a fractured right index finger he sustained in an altercation on or about August 22, 2002.  (Filing 113, Second Amended Complaint ¶¶ 29-37.)

13.    Jones was treated at the facility emergency room the day of the altercation, presenting with a laceration to his forehead and contusion to his left eyebrow.  On the day of the injury, the TSCI medical staff "sent him for a CT scan because we thought he had an orbital fracture."  Further, Dr. Williams "personally did an eye exam on him."  (Filing 189-2, Williams Depo. 21:3-10.)

14.    Jones alleges that he complained about the pain in his finger on the day of the altercation, August 22, 2002, and the TSCI medical personnel "stall[ed]" getting an x-ray.  (Filing 193-13, Informal Grievance Resolution Form, Sept. 28, 2002.)  Dr. Williams claims that Jones "did not complain of an injury to his right hand or fingers" on August 22, 2002, and "didn't complain about that for a long time."  (Filing 189-6, Williams Aff. ¶ 16; Filing 189-2, Williams Depo. 21:3-16.)  On September 10 or 11, 2002, Jones' right hand was x-rayed, which revealed a fracture.  (Filing 189-6, Williams Aff. ¶ 16.)

15.    Dr. Williams then referred Jones to an outside orthopedist, who

---

[4]Jones complains that Dr. Fosnaugh failed to perform eight tests requested by Plaintiff; that shortly after Dr. Fosnaugh's examination, Jones has emergency colon surgery "because of a now discovered tumor"; and that Jones was forced to take anti-psychotic medication at some point.  (Filing 192, at 3.)  Because Plaintiff's Second Amended Complaint (filing 113) only makes claims regarding the medical treatment provided for Jones' hypertension and fractured finger, these allegations are irrelevant.

examined Jones' hand on or about November 14, 2002, by which time the fracture had healed and surgery was not indicated.  (Filing 189-6, Williams Aff. ¶ 17.)

## II.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue.  *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).  In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion.  *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'"  *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)).  Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof

7

> concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

"A prison official's deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Popoalii v. Correctional Medical Servs.*, 512 F.3d 488, 499 (8th Cir. 2008). In order to establish a prima facie case of deliberate indifference, the inmate-plaintiff must demonstrate that he suffered "from an objectively serious medical need and the 'prison officials actually knew of[,] but deliberately disregarded[,]' that need." *Id.* (quoting *Alberson v. Norris*, 458 F.3d 762, 765-66 (8th Cir. 2006)).

I shall assume for purposes of this motion for summary judgment that Jones' hypertension and fractured finger were serious medical needs of which the defendants were aware. Thus, the issue is whether the defendants deliberately disregarded Jones' serious medical needs.

The plaintiff in a deliberate-indifference case "must clear a substantial

evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment." *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Id.* at 1118-1119 (internal quotation and citation omitted). Because medical malpractice alone is not actionable under the Eighth Amendment, "the prisoner must show more than negligence, more even than gross negligence . . . ." *Popoalii*, 512 F.3d at 499 (internal quotation omitted).

### *Jones' Hypertension*

Here, it is clear that the defendants tried mightily to solve Jones' hypertension problems through the attempted administration of numerous blood-pressure medications and consultations with the prison medical staff. Their attempts, however, were largely unsuccessful due to Jones' repeated refusals to continue with the medications before they became effective. The defendants reacted to Jones' claims that these medications caused "life-threatening" side effects by prescribing different medications, always with an overriding goal of reducing his blood pressure. When Dr. Williams began to suspect that these "side effects" were in reality a heart problem, Jones refused to undergo the recommended heart monitoring.

Significantly, the internal medicine specialist who examined Jones at his family's request opined that Dr. Williams and his staff "were . . . keeping a close eye on things, to try to bring his blood pressure under control. They had actually consulted other doctors, including heart specialists." (Filing 189-3, Fosnaugh Depo. 12:18-23.) Dr. Fosnaugh stated that TSCI medical personnel were adequately and appropriately attempting to control Jones' hypertension, and "they were trying to do the best possible job"; nothing that had been done was inappropriate; "they were doing all the reasonable things"; and "[Jones'] unwillingness to use medications was

9

making management more difficult." (*Id.* at 15:22-17:18.) Dr. Fosnaugh concluded that "Mr. Jones is receiving the best possible care by the medical staff at the Tecumseh Facility. The care seems appropriate and reasonable and is only hampered by Mr. Jones' own unwillingness to comply with the medication regimen." (Filing 189-3, at CM/ECF p. 25.)

Jones has presented no evidence supporting his claim that the medical treatment provided by the TSCI medical staff was constitutionally inadequate—only his own affidavits complaining about what he perceived to be substandard medical care. "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997). *See also Miller v. Citizens Sec. Group, Inc.*, 116 F.3d 343, 346 (8th Cir.1997) ("A conclusory statement in an affidavit, however, cannot create a genuine issue of material fact which precludes summary judgment.").

While Jones met his burden of showing that the TSCI medical staff was aware of his hypertension, a serious medical need, he has failed to show that the defendants deliberately disregarded that need. *See Meuir*, 487 F.3d at 1119. Further, Jones has failed "to provide evidence from which a trier of fact could draw an inference that [his] medical treatment was grossly inappropriate or evidenced intentional maltreatment." *Dulany*, 132 F.3d at 1241. Accordingly, I shall grant summary judgment in favor of the defendants on this claim.

### *Jones' Fractured Finger*

Jones claims that the defendants unreasonably delayed in performing an x-ray on his fractured finger (19 days) and in referring him to a specialist (62 days). However, whether the defendants should have acted sooner in performing x-rays on

Jones' finger or in referring him to a specialist is, at most, a question of negligence that does not equate to deliberate indifference. *Hartsfield v. Colburn*, 491 F.3d 394, 398 (8th Cir. 2007). *See Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (delay of a month between tentative diagnosis that inmate plaintiff's finger was fractured and date inmate's hand was x-rayed amounted to negligence, which does not rise to a constitutional violation); *Bryan v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998) (some delay in treating an inmate's broken hand, even if negligent, did not constitute deliberate indifference); *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997) ("Although the prison doctors may not have proceeded from their initial diagnosis to their referral to a specialist as quickly as hindsight perhaps allows us to think they should have, their actions were not deliberately indifferent.").

Jones further claims that as a result of the delay, his fracture was never set or corrected and he "does not have full function of his right hand." (Filing 192, at 13.) However, Jones has filed no medical evidence supporting his claimed loss of function, nor describing the effect this alleged delay in treatment had on Jones' medical condition.

> When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, "the objective seriousness of the deprivation should also be measured 'by reference to the effect of delay in treatment.'" [*Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995)] (quoting *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)). To establish this effect, the inmate "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment . . ." *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (quoting *Hill*, 40 F.3d at 1188). While Laughlin submitted evidence documenting his diagnosis and treatment, he offered no evidence establishing that any delay in treatment had a detrimental effect and thus failed to raise a genuine issue of fact on an essential element of his claim. As such, the grant of summary judgment in favor of the Appellees was proper. *Dulany* [*v. Carnahan*], 132 F.3d [1234,] at 1243 [(8th Cir. 1997)] (holding that

11

> summary judgment in favor of the defendants was not in error as to inmate-plaintiffs Anderson and Allen, where neither Anderson nor Allen submitted verifying medical evidence indicating that a delay in treatment of her acute cardiac condition resulted in an adverse effect).

*Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005). As in *Laughlin*, because Jones has not presented "verifying medical evidence" establishing the detrimental effect of the alleged delay in treatment, he has necessarily failed to raise a genuine issue of fact on an essential element of his claim, making summary judgment in favor of the defendants proper.

## IV. CONCLUSION

Assuming for the purposes of the defendants' motion for summary judgment that Jones' hypertension and fractured finger constitute serious medical needs, Jones' affidavits do not clear the "substantial evidentiary threshold" required to show that the defendants deliberately disregarded his serious medical needs. Thus, the defendants are entitled to judgment as a matter of law because Jones has failed to make a sufficient showing on "deliberate disregard"—an essential element of his case upon which he has the burden of proof.

IT IS ORDERED:

1. The motion for summary judgment filed on behalf of defendant Dave Thomas (filing 187) is denied as moot, and this case shall be dismissed against him without prejudice;

2. The motion for summary judgment filed on behalf of defendants Janssen Williams, M.D., and Kris Galatis (filing 187) is granted, and these parties shall be dismissed with prejudice;

3. Pursuant to the court's prior order (filing 161), defendants Elliott, Kohl, Britten, LaMar, Nebraska Department of Correctional Services, and Frank Hopkins are dismissed with prejudice;

4. Defendant Cherry, who was not sued in Plaintiff's second amended complaint (filing 113), is dismissed without prejudice;

5. By separate judgment, this case shall be dismissed.

March 14, 2008.

            BY THE COURT:
            s/ *Richard G. Kopf*
            United States District Judge